# INVESTORS ACCEPTANCE COMPANY OF LIVINGSTON, INC., Appellant, v. JAMES TALCOTT, INC., Appellee. —454 S.W.2d 130.

Middle Section. December 5, 1969.

Certiorari Denied by Supreme Court May 4, 1970.

308

Val Sanford, Nashville, James M. McDaniel, Decatur, Ga., John Hunter Smith, Livingston, for appellant.

Millard V. Oakley, Livingston, James A. Stanfield, Atlanta, Ga., for appellee.

TODD, J. Defendant, Investors Acceptance Company of Livingston, Inc., has appealed from a chancellor's decree awarding complainant, James Talcott, Inc., a judgment in the amount of $732,548.02 plus interest, setting aside a deed, and ordering the sale of certain property for satisfaction of the said judgment. Edwin Smith, who was made a party hereto for the purpose of attaching property or funds in his hands, has not appealed.

Complainant is a national lending institution, engaged in financing the activities of various business undertakings. Defendant is, or was, engaged in the business of making small loans to individuals. The parties entered into an agreement whereby complainant would make loans or advances to defendant on a revolving basis, that is, with new advances and payments of old advances being made simultaneously and daily. Said agreement further provided that said loans or advances should be secured by the assignment to complainant of the notes or other evidences of debt secured by defendant from its borrowers. Provision was made in said agreement for termination, demand of amount due and foreclosure upon the security.

Complainant had a similar arrangement with another corporation called The Gibraltar Company. For reasons not material to this suit, the defendant executed a guaranty agreement whereby it guaranteed payment of all amounts due complainant from said Gibraltar Company.

In June, 1966, complainant became dissatisfied with the performance of both contracts, and sent to both defendant and Gibraltar Company a notice of termination and demand for payment. Thereafter, complainant undertook to carry out separate foreclosure sales of the assets held as security for the indebtedness under said contracts.

On August 1, 1966, complainant mailed to defendant a notice that the notes receivable held as security for its indebtedness would be sold at the courthouse door in Louisville, Kentucky, on August 8, 1966. On the latter date, complainant purchased said notes and credited the purchase price upon the indebtedness primarily due from defendant.

On July 28, 1966, complainant mailed a notice to Gibraltar Company that its notes receivable pledged to complainant would be sold at the courthouse door in Atlanta, Georgia, on August 4, 1966. On the latter date, complainant purchased said security and credited the purchase price upon the indebtedness due from Gibraltar Company.

This suit was filed to collect from defendant $841.02 deficiency balance due upon its own indebtedness after said foreclosure and $731,707.00 deficiency balance due after said foreclosure from Gibraltar Company and guaranteed by defendant.

The answer of the defendant denied any indebtedness to complainant, denied that any such indebtedness was past due, denied that complainant had lawfully conducted the said foreclosure sales and alleged that complainant had wrongfully terminated said financing agreement. Incorporated into the answer was a cross-bill alleging $10,000,000.00 damages.

On July 20, 1967, the chancellor entered the following order:

"The above cause came on to be further heard upon the motion to dismiss the Cross-bill of Investors Acceptance Company of Livingston, Inc., as filed by the original complainant James Talcott, Inc.

"After hearing argument of counsel and upon due consideration of the motion the Court is of the opinion that the motion is well-taken and should be sustained on the grounds that the Cross-bill shows on its face that Cross-complainant's cause of action sounds in tort and

is a suit for *unliquidated* damages and Cross-complainant has a plain, adequate and complete remedy at law.

"IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED by the Court that the Cross-bill filed by the original defendant Investors Acceptance Company of Livingston, Inc. be and the same is hereby dismissed."

No exception, prayer for appeal, or other objection to said order is found at any point in the record.

Thereafter, on July 16, 1968, the chancellor heard oral evidence upon the issues presented by the bill and answer.

On November 2, 1968, the chancellor filed a written memorandum opinion containing the following:

"The Financing Agreement provided that all obligations owing complainant were payable on demand after thirty days written notice. Such demand was made; IAC failed to pay within thirty days; complainant then proceeded with the enforcement of its remedies as set out in the Financing Agreement. It appears from the proof that complainant had, prior to June 30, 1966, cooperated with debtors in effort to find buyers for said corporations, but without success. I hold that the sales conducted by the complainant of the collateral held by it were conducted in substantial compliance with the terms of the Financing Agreement. At no time did IAC offer or attempt to offer evidence to overcome the prima facie proof offered by complainant as to Gibraltar's debt, nor the balance due thereon after complainant credited the sale price of Gibraltar's collateral. Complainant's records of said indebtedness were admitted in evidence. IAC never attempted by

any substantial proof to establish its solvency on June 30, 1966. IAC attempted to defend on the ground that the sale of the IAC collateral, as it was conducted by complainant, was not 'commercially reasonable.' In that regard the *burden of proof was on the defendant,* Investors Acceptance Company of Livingston, Inc., and I hold that *it failed to carry the burden of proof.*

\* \* \* \* \*

"In summary, I hold that the evidence conclusively shows that the debts were due by IAC under the Financing Agreement and the Guaranty Agreement, and that complainant had the right to demand payment and to sell the collateral. *IAC failed to show that the sale was not conducted in a commercially reasonable manner,* and complainant is therefore entitled to a judgment in the amount of $732,548.02 plus interest. \* \* \*" (Emphasis supplied.)

On January 20, 1969, after hearing a petition to rehear and revise the opinion, the chancellor entered the final decree from which this appeal was taken. Said decree begins with the following recitations:

"The above cause was regularly heard before the Honorable Scott Camp, Chancellor, during the regular term of the Overton County Chancery Court, said matter having been heard on July 16, 1968, upon the original bill, the answer of the named defendants, along with various pleadings and oral and documentary proof introduced into open court. \* \* \*"

Said decree awarded complainant a judgment in the amount of $732,548.02 and interest, and allowed appeal therefrom, but contained no reference to the former de-

cree dismissing the cross-bill, any exceptions thereto, or appeal therefrom.

Defendant-appellant has filed six assignments of errors. The fifth and six assignments are as follows:

"THE CHANCERY COURT ERRED IN DISMISSING THE CROSS-BILL OF I.A.C.L.

"THE CHANCERY COURT ERRED IN NOT FINDING THAT TALCOTT HAD BREACHED THE FINANCING AGREEMENT WITH I.A.C.L. AND IN NOT ASSESSING DAMAGES BOTH COMPENSATORY AND PUNITIVE FOR THAT BREACH."

As previously pointed out, the cross-bill was dismissed on July 20, 1967, and the record reflects no complaint, objection, exception or attempt to appeal therefrom at that time or at any subsequent time.

Sec. 27-312 T.C.A. provides as follows:

"*27-312. Time for filing appeal and bond.*—When an appeal or appeal in the nature of a writ of error is prayed from a judgment or decree of an inferior court to the Court of Appeals or Supreme Court, the appeal shall be prayed and appeal bond shall be executed or the pauper oath taken within thirty (30) days, from the judgment or decree of the court, but for satisfactory reasons shown by affidavit or otherwise, and upon application made within the thirty (30) days, the court may extend the time to give bond or take the oath, but in no case more than thirty (30) days additional.

"The expiration of a term of court shall have no effect in the application of this section. In all cases where the appeal has not been prayed for within the

time prescribed in this section, the judgment or decree may be executed. [Acts 1885, ch. 65, secs. 1, 2; Shan., secs. 4898, 4899; mod. Code 1932, secs. 9047, 9048; mod. C. Supp. 1950, sec. 9047.]''

Sec. 25-102 T.C.A. provides as follows:

''*25-102. Interlocutory or final*—A judgment or decree may be interlocutory or final, to be determined by the subject-matter and substantial purport thereof. [Code 1858, sec. 2971; Shan. sec. 4699; Code 1932, sec. 8829.]''

██ A final decree is one which disposes of the whole merits of a cause. Gibson's Suits in Chancery, Fifth Edition sec. 618.

In Hart v. Pierce, 169 Tenn. 411, 88 S.W.2d 798 (1935) the Supreme Court said:

''(7) 1. The motion to dismiss the appeal because premature is overruled. The practical effect of the action of the chancellor as a whole was a final disposition of the cause in that court. He dismissed the cross-bill, and he was within his discretionary powers in granting an appeal from his order overruling the demurrer to the original bill.'' 169 Tenn. p. 420, 88 S.W. 2d p. 801.

Thus the Supreme Court recognized as final and appealable the dismissal of a cross-bill, while recognizing as discretionary the appeal from an order overruling a demurrer.

In Guion v. Nat. Bank of Commerce, 31 Tenn.App. 540, 218 S.W.2d 739 (1948), this Court held that decrees entered on April 10, 1944 and May 4, 1944 dismissing bills to revoke trusts were final and appealable, and that

an appeal from a subsequent decree entered on May 23, 1947 did not bring the former decrees to the appellate court for review.

■■ A broad appeal from a final decree in equity does bring the whole case before the appellate court for review. Fox v. River Heights, Inc., 22 Tenn.App. 166, 118 S.W.2d 1104 (1938). However this rule applies to the final decree and all previous interlocutory decrees in respect to the same action. A cross-bill presents a separate action; its dismissal is not an interlocutory, but a final, decree; and appeal therefrom must be taken as provided by law. After the lapse of eighteen months it is too late to complain of the former decree in appealing from a subsequent decree which disposed of an entirely different action.

The fifth and sixth assignments of error are respectfully overruled.

The third and fourth assignments of error are as follows:

"THE CHANCERY COURT ERRED IN HOLDING THAT THE TOTAL OR ENTIRE OBLIGATION OWED TALCOTT BY I.A.C.L. WAS PAYABLE ON DEMAND AFTER THIRTY DAYS NOTICE AND IN HOLDING THAT PROPER DEMAND AND NOTICE WERE GIVEN IN THIS CASE.

"THE CHANCERY COURT ERRED IN HOLDING THAT TALCOTT HAD ANY RIGHT TO TERMINATE ITS FINANCING AGREEMENT WITH GIBRALTAR AND MAKE DEMAND ON IT FOR THE ENTIRE OBLIGATION DUE IT BY GIBRALTAR AS TALCOTT DID IN THIS CASE."

Section 5 of the financing agreement between complainant and defendant as amended by agreement, provided:

"5. All obligations arising pursuant to this agreement *after thirty days prior written notice thereof* or pursuant to any supplement or amendment hereto or any portion thereof shall be payable by us on demand; * * *" (emphasized words were added by amendment).

A letter from complainant to defendant dated June 30, 1966 and delivered on July 5, 1966 contains the following:

"Please be advised that due to a breach of the financing agreements with us dated as follows: Investors Security Corporation, May 19, 1965; Investors Acceptance Company of Chattanooga, May 19, 1965; Investors Acceptance Company of Carthage, May 19, 1965; Investors Acceptance Company of Smithville, May 19, 1965; Investors Acceptance Company of Hamilton County, May 19, 1965; Investors Acceptance Company of Irvine, May 19, 1965; Investors Acceptance Company of Livingston, September 2, 1965; Investors Acceptance Company of Cleveland, January 6, 1966; Investors Acceptance Company of Beattyville, May 19, 1965; as the same may apply, we hereby give notice of our desire to terminate said agreements.

"Accordingly, *demand is hereby made for payment of the amounts due and owing to us under said agreements upon receipt of this letter.* Said agreements are hereby terminated and our rights as defined therein shall be enforced according to their terms. Signed, James Talcott, Inc., G. M. Pettinger, Assistant Secretary." (Emphasis added.)

It is to be emphasized that demand was indicated "upon receipt of this letter," which was not accomplished until July 5, 1966.

■ On August 1, 1966, when complainant wrote defendant that the foreclosure sale would be held on August 8, the required 30 days had not elapsed after demand "upon receipt of this letter" (on July 5). On August 8, when the foreclosure sale was held, 30 days had elapsed from "the receipt of this letter." Thus defendant's debt was not due when notice of foreclosure was given, but it was due when the foreclosure sale was held.

The financing agreement between complainant and The Gibraltar Company contained the following provision:

"5. All Advances and all other amounts chargeable to our account under this Agreement shall be payable by us on demand; * * *."

On June 30, 1966, the following letter was sent by complainant to The Gibraltar Company:

"Please be advised that due to a breach of the financing agreements with us dated September 3, 1963, as the same may apply, we hereby give notice of our desire to terminate said agreements.

Accordingly, demand is hereby made for payment of the amounts due and owing to us under said agreements *upon receipt of this letter*. Said agreements are hereby terminated and our rights as defined therein shall be enforced according to their terms." (Emphasis added.)

■ There is no evidence in the record as to the date of delivery or non-delivery of this letter, hence it must be

presumed to have been delivered within a reasonable time.

■ On July 28, 1966, when notice of foreclosure sale was mailed, the Gibraltar Company debt had been rendered immediately due by demand, no 30 day notice being required as was required by the amendment to defendant's financing agreement.

■ The fourth assignment, supra, also complains of an alleged wrongful termination of the Gibraltar financing agreement, however such termination is a matter between Gibraltar and complainant, and would not affect the liability of defendant under its guaranty. This is true because complainant had the unlimited right to demand payment at any time on any part of the indebtedness without terminating the general financing agreement.

To the extent indicated, the third assignment is sustained. Otherwise the third and fourth assignments are respectfully overruled.

The first and second assignments of error are as follows:

"THE CHANCERY COURT ERRED IN HOLDING THAT THE 'SALE' OF THE ASSETS OF I.A.C.L. BY TALCOTT WAS LAWFUL AND VALID, RESULTING IN A 'DEFICIENCY' WHICH WAS PROPERLY CHARGEABLE TO I.A.C.L.

"THE CHANCERY COURT ERRED IN HOLDING THAT THE SALE OF THE ASSETS OF THE GIBRALTAR COMPANY WAS VALIDLY AND LEGALLY CONDUCTED RESULTING IN A DEFICIENCY WHICH WAS PROPERLY CHARGE-

ABLE TO I.A.C.L. UNDER AN ALLEGED GUAR-
ANTY AGREEMENT."

Appellant insists that Georgia law governs the rights
and duties of the parties to the financing agreement be-
tween complainant and defendant, and that New York
law governs the rights and duties of the parties under
the financing agreement between The Gibraltar Company
and complainant and the guaranty thereof by defendant.

Sec. 24-610 T.C.A. provides as follows:

"*24-610. Evidence of foreign law.*—Any party may
also present to the trial court any admissible evidence
of such laws, but, to enable a party to offer evidence
of the law in another jurisdiction or to ask that judicial
notice be taken thereof, reasonable notice shall be given
to the adverse parties either in the pleadings or other-
wise. [Acts 1943, ch. 137, sec. 4; C. Supp.1950, sec.
9773.7 (Williams, sec. 9773.4).]"

A search of the pleadings, testimony, statements
of counsel, and orders of court fails to reveal any notice
of reliance upon the laws of another state. There has been
no admission by counsel that such notice occurred, as in
Gordons Transports, Inc. v. Bailey, 41 Tenn.App. 365,
294 S.W.2d 313 (1956). The above statute does not au-
thorize reliance upon laws of other states for the first
time in an appellate court. All contentions of the parties
should be first submitted to the trial courts before being
urged on appeal. Tennessee Supreme Court Rules, Rule
14(5). Kyker v. General Motors Corporation, 214 Tenn.
521, 381 S.W.2d 884 (1964) Ethridge v. First National
Bank of Jackson, 54 Tenn.App. 46, 387 S.W.2d 835
(1964).

■ For purposes of this appeal, the applicable law must be presumed to be the same as that of Tennessee. Mutual Life Ins. Co. of New York v. Templeton, 50 Tenn. App. 615, 362 S.W.2d 938 (1962).

Appellant next insists that it was the duty of complainant to proceed (with foreclosure) (1) in good faith and (2) in a commercially reasonable manner. The following sections of Tennessee Code Annotated are applicable:

"*47-1-203. Obligation of good faith.*—Every contract or duty within chapters 1 through 9 of this title imposes an obligation of good faith in its performance or enforcement. [Acts 1963, ch. 81, sec. 1 (1-203).]"

Sec. 47-1-201 * * *

"(19) 'Good faith' means honesty in fact in the conduct or transaction concerned."

Sec. 47-9-504

\*    \*    \*    \*    \*    \*

"(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms *but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.* Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, *reasonable notification of the time and place of* any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made *shall be sent* by the secured party *to the debtor,* and except in the case of consumer goods to any

other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or who is known by the secured party to have a security interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale." (Emphasis supplied.)

The opinion of the chancellor quoted supra, indicates his holding that the burden of showing commercial reasonableness of the foreclosure sale was upon defendant. In Mallicoat v. Volunteer Finance & Loan Corp., 57 Tenn. App. 106, 415 S.W.2d 347 (1966), there was a suit for deficiency after foreclosure sale of an automobile, and a separate counter-suit for damages for improper foreclosure. The finance company proved only that a notice had been mailed to debtor, but returned undelivered, and that posters had been displayed at times and places unknown to the witness. This Court held:

"[9] Since the proof incident to advertisement and sale was peculiarly within the knowledge of Volunteer Finance, the burden was upon it to show a compliance with the act. Compare cases arising under Conditional Sales Act, including Whitelaw Furn. Co. v. Boon, 102 Tenn. 719, 52 S.W. 155; Beets v. John R. Jarnagin Motor Co., 180 Tenn. 358, 175 S.W.2d 326; Kidd v. Condry, 25 Tenn.App. 182, 154 S.W.2d 530.

"The testimony of Mr. Austin above detailed that the property was disposed of at a public sale, standing alone, was not sufficient to carry this burden.

"Under the circumstances of this case, we hold the plaintiff-creditor failed to give the debtor reasonable notice of the sale and failed to carry the burden of showing a 'commercially reasonable' sale." 57 Tenn. App. pp. 114, 115, 415 S.W.2d p. 351.

As a result, *Mallicoat* was remanded to the trial court for determination of the amount of set-off due to the debtors and the amount still due plaintiff, if any. Under the above-quoted holding of this Court, the burden of proof was upon complainant to show that the foreclosure sales in this case were commercially reasonable.

In *Mallicoat,* this Court also said:

"[2, 3] The requirement that the property be disposed of in a 'commercially reasonable' manner seems to us to signify that the disposition shall be made *in keeping with prevailing trade practices among reputable and responsible business and commercial enterprises engaged in the same or a similar business.* It is general in scope and effect and is not mutually exclusive of the express requirement that notice of the intended disposition, whether by public or private sale, be sent to the debtor. The purpose of this notice, without doubt, is to enable the debtor to protect his interest in the property by paying the debt, finding a buyer or being present at the sale to bid on the property or have others do so, to the end that it be not sacrificed by a sale at less than its true value. Compare Range Motor Co. v. Tipton, 161 Tenn. 427, 33 S.W.2d 75, a suit under the Conditional Sales Statute." 57 Tenn.App., pp. 111, 112, 415 S.W.2d p. 350. (Emphasis supplied.)

The record in this case is astonishingly devoid of details of the steps, if any, taken by the complainant to con-

duct in good faith, commercially reasonable sales. The notice given to the debtor in each case is of doubtful sufficiency, either in manner of dispatch or in duration. Further doubt of good faith and commercial reasonableness is reflected by the following tabulation of events and facts:

Foreclosure of defendant's security:

June 30, 1966 (Date of demand notice)
Security Held     \$126,514.14
Indebtedness     67,474.56

June 30-Aug. 8, 1966     Office of defendant taken over by complainant and collections made by complainant from makers of notes held as security.

August 1, 1966     Notice of sale mailed to defendant's office then in charge of complainant.

August 8, 1966 (Date of sale of security)
Security held     \$111,175.75
Indebtedness     52,659.04 (55,174.02)
Sale (purchase) price     54,333.00 (58%)

(Note that from June 30 to August 1 the face amount of security was reduced from \$126,514.14 to \$111,175.75 ostensibly by collections made by complainant. At the same time indebtedness was reduced from \$67,474.56 to \$52,659.05. Note also that certain "expenses" increased total indebtedness to \$55,174.02, against which the sale price was credited, leaving a deficiency of \$841.02.)

August 8, 1966 (same date)—Resale of security to Edwin Smith in Livingston, Tennessee
Security sold     \$103,585.86
Sale price     62,151.52 (60%)

(Note that whereas receivables of \$111,175.75 were purchased by complainant at the foreclosure sale, on the same date complainant resold only \$103,585.86 in receivables to Edwin Smith. The reduction is obstensibly the result of crediting additional collections from the customers of defendant which collections were not credited to defendant.)

There is not a shred of evidence in the record indicating whom (except defendant) was notified that a public sale would be held, or how, or when, nor the manner of holding the sale, nor who was present, nor what efforts were made to inform prospective buyers of the nature of the property being sold.

Foreclosure of the Gibraltar Company security

June 30, 1966 (Date of demand)
Total security held     \$3,280,181.09
Indebtedness     1,794,103.90

July 28, 1966               Notice to Gibraltar
                                 of sale on August 4

July 31, 1966               Total security held   3,185,793.93
                                   Indebtedness        1,710,090.84

(Note: The record does not explain how the security was reduced $94,387.16 during July while the debt reduced only $84,013.06)

Aug. 4, 1966—10:00 A.M. Sale delayed by injunction

Aug. 4, 1966—"Later in the day"—injunction lifted and sale held at unstated time.

                        Face Value of
                        security sold—        3,168,726.58
                        Sales (purchase)
                        price                1,008,210.00  (31.8%)
                        Deficiency after sale   727,223.73

Other than the notice mailed to Gibraltar Company, there is no evidence of any effort to publicize the sale, or the manner in which the delayed sale was held, except the following testimony:

"Q. The sale was had there at the Fulton County Courthouse?

A. Yes, sir.

Q. Mr. Carroll, I want to ask you to relate to the Court please, sir, whether or not the notice of this sale was generally known in the trade circles and whether or not you talked with other finance companies about it, trying to obtain purchasers?

A. Yes, I did."

There is no other testimony as to which or how many companies were notified, or how, and especially as to re-notification of the time of the delayed sale. There is no explanation of why complainant was willing to pay 58% and Mr. Smith was willing to pay 60% of the value of defendant's receivables, but complainant paid only 31.8% of the value of the Gibraltar receivables.

As stated by this Court in *Mallicoat*, supra:

"[6, 7] We are also of opinion the creditor failed to conduct the sale in a 'commercially reasonable' manner. One element bearing on this question of whether the sale was 'commercially reasonable' is lack of notice, known to the creditor. In addition, *the creditor had in its possession and keeping the evidence of when and where the notices were posted, whether the property was adequately described in the notices and the length of time the notices remained posted.* Since it failed to introduce the employee who made up and posted the notices, in the absence of any explanation, *we must assume the testimony* of such employee or agent *would not have been favorable to plaintiff* Volunteer Finance *on the question whether the notice of sale conformed to the prevailing custom and usage* in the automobile and finance trade with respect to advertising a sale of repossessed automobiles.

"[8] 'Failure to call an available witness possessing peculiar knowledge concerning facts essential to party's cause, direct or rebutting, or to examine such witness as to facts covered by his special knowledge, especially if witness be naturally favorable to party's contention, relying instead upon evidence of witnesses less familiar with the matter, gives rise to an inference that testimony of uninterrogated witness would not sustain contentions of such party.' National Life & Accident Ins. Co. v. Eddings, 188 Tenn. 512, 221 S.W.2d 695." (Emphasis supplied.) 57 Tenn.App. pp. 113-114, 415 S.W.2d p. 351.

█ The adverse inference from failure to produce evidence is not itself substantive evidence, but it does

negative any inference which might be indulged in favor of the regularity or commercial reasonableness of the sales.

Other complaints about the place of sale, or the steps taken or omitted by complainant need not be considered in view of the conclusion of this Court that the complainant had the burden of proving and failed to prove that either of the foreclosure sales were commercially reasonable.

Many authorities from other jurisdictions have been cited and examined, none of which are in conflict with the holdings, herein, especially that of *Mallicoat,* supra, which presents a closely analogous situation and which declares the law of Tennessee without equivocation.

It is insisted that the failure of the complainant to prove commercially reasonable sales is fatal to the entire claim of complainant, however this insistence is not supported by *Mallicoat,* wherein this Court said:

"The result of the creditor's failure to give notice and dispose of the property in a 'commercially reasonable' manner remains to be considered.

"The Act, T.C.A. sec. 47-9-507, provides in part:

'If the disposition has occurred the debtor * * * has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this Part. If the collateral is consumer goods, the debtor has a right to recover in any event an amount not less than the credit service charge plus ten percent (10%) of the principal amount of the debt or the time price differential plus ten percent (10%) of the cash price.'

"[10] There is no finding by the trial judge on this question and the record is not such that we can determine the rights of the parties. Accordingly, the case is remanded for the determination of the amount still due plaintiff, if any, after allowing defendants an off set for the amount due them."

It is further insisted that the failure to hold a commercially reasonable sale of the security for the Gibraltar Company debt resulted in a complete discharge of the guaranty obligation of the defendant. Cases cited in support of this insistence are not in point or support the policy of pro tanto release, that is, release of the surety to the extent of the loss sustained by the improper sale. See Norton v. National Bank of Commerce of Pink Bluff, 240 Ark. 143, 398 S.W.2d 538 (1956) wherein an automobile dealer who endorsed a conditional sales note to a bank was sued for a deficiency after foreclosure sale. The Arkansas Supreme Court held that the dealer-endorser as a "debtor" was entitled to notice of sale and that:

"[5] Finally, what is Norton's measure of damages? We do not agree with his contention that the bank's failure to give him notice of the intended sale completely discharged his obligation. For the most part the Code follows the theory formerly applicable to mortgages, by which the debtor was entitled to any surplus realized upon foreclosure and was liable for any deficiency. Section 85-9-504(2). The Code also provides that if the secured party has disposed of the collateral in a manner not in accordance with the Code 'any person entitled to notification * * * has a right to recover from the secured party any loss caused by a failure to comply' with the provisions of the Code. Section 85-9-507(1).

"[6] Upon the issue of Norton's damages simple considerations of fair play cast the burden of proof upon the bank. It was the bank which wrongfully disposed of the car without notice to the debtors. Thus it was the bank's action that made it at least difficult, if not impossible, for Norton to prove the extent of his loss with reasonable certainty. A chattel such as a car may well be a thousand miles away before the debtor learns of its sale without notice. It would be manifestly unfair for the creditor to derive an advantage from its own misconduct. We think the just solution is to indulge the presumption in the first instance that the collateral was worth at least the amount of the debt, thereby shifting to the creditor the burden of proving the amount that should reasonably have been obtained through a sale conducted according to law. The extent to which the penalty set out in sec. 85-9-507(1) may be applicable in the case at bar is an issue that may depend upon the further development of the proof.

"Since the case was not tried upon the principles of law that we deem to be controlling the judgment must be reversed and the cause remanded for a new trial." 398 S.W.2d, pp. 541, 542.

▇ Upon full examination of the record and the many authorities cited by counsel, this Court is satisfied that the complainant has failed to carry its burden of proof that the two foreclosure sales involved herein were so conducted as to be commercially reasonable. Having had its day in court on this issue, complainant is not entitled to litigate same further.

▇ As in *Mallicoat* and *Norton,* supra, this cause will be remanded to the chancellor for the sole purpose of

ascertainment of what amount, if any, is due complainant after allowing defendant credit for the fair value of the security improperly sold by complainant. As stated in the foregoing authority, the sale of the security under the circumstances shown raises a prima facie presumption that the security sold for less than its true value and that the true value was prima facie sufficient to satisfy the debt in each case. Upon remand, the burden will be upon complainant to overcome each of these prima facie presumptions by showing the true, actual value of the security on the date it was sold, or the price which would have been paid for the security at a foreclosure sale held in a commercially reasonable manner.

The amount of indebtedness due complainant independently of the foreclosure sale was not controverted, and has heretofore been ascertained by the chancellor. Since defendant has had its day in court on this issue, the amount found to be due by the chancellor will not be subject to revision upon remand, except to credit same with such damage as resulted from failure to hold commercially reasonable sales.

To the extent indicated, the decree of the chancellor is affirmed. To the extent otherwise indicated, the decree of the chancellor is reversed and the cause is remanded for further proceedings consistent with the holdings herein.

The costs of this appeal are taxed against the appellee, James Talcott, Inc.

Affirmed in part.

Reversed in part.

Remanded.

Shriver, P. J. (M.S.), and Puryear, J., concur.